**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ELAN CATERERS, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>HARLEYSVILLE INSURANCE COMPANY,<br><br>        Defendant. | Civil Action No. 21-19497 (SDW) (JSA)<br><br>Civil Action No. 21-19539 (SDW) (JRA) |
| FRANKLIN LAKES COUNTRY CAFÉ, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>HARLEYSVILLE PREFERRED INSURANCE COMPANY,<br><br>        Defendant. | **OPINION**<br><br>June 29, 2022 |

**WIGENTON**, District Judge.

Before this Court are Defendants Harleysville Insurance Company ("HIC") and Harleysville Preferred Insurance Company's ("HPIC") (collectively, "Defendants") Motions to Dismiss Plaintiffs Elan Caterers, LLC ("Elan") and Franklin Lakes Country Café, LLC's ("FLCC") (collectively, "Plaintiffs") Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1332 and 1441, respectively. This consolidated opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendants' motions are **GRANTED.**

I.     BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs and several other New Jersey restaurants filed the instant lawsuit on November 2020, in the Superior Court of New Jersey, Law Division, Bergen County, against Defendants and several other insurers, seeking coverage for losses they sustained during the COVID-19 pandemic. (See Civ. Nos. 21-19497 and 21-19539 at D.E. 1-1 at Ex. A ("Compl.").)  The Complaint asserts two counts: (1) declaratory judgment that Plaintiffs are entitled to coverage under their respective insurance contracts with Defendants (Count I) and (2) breach of contract (Count II).  (Compl. ¶¶ 105–09.)  In October 2021, the Superior Court granted Defendants' Motion to Sever, creating separate lawsuits for Elan's claims against HIC (now Civ. No. 21-19497) and FLCC's claims against HPIC (now Civ. No. 21-19539), which Defendants removed to this Court in November 2021.  (See Civ. Nos. 21-19497 and 21-19539 at D.E. 1-1 at Ex. B.)

Following removal, Defendants moved to dismiss the Complaint for failure to state a claim. (Civ. No. 21-19497 at D.E. 9 and Civ. No. 21-19539 at D.E. 6.)  Plaintiffs' counsel filed an omnibus brief in opposition to Defendants' motions (and presumably in opposition to other insurance defendants' motions in related cases).  (Civ. No. 21-19497 at D.E. 11 and Civ. No. 21-19539 at D.E. 7 ("Pl. Opp. Br.").)  Defendants thereafter filed reply briefs.  (Civ. No. 21-19497 at D.E. 12 and Civ. No. 21-19539 at D.E. 10.)  Because Defendants' briefs and the relevant contracts are substantively identical, and because Plaintiffs' briefs are identical, this Court will decide the pending motions in a single opinion.

II.    LEGAL STANDARD

An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual

allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (stating that Rule 8 "requires a 'showing,' rather than a blanket assertion, of an entitlement to relief").

When considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (discussing the *Iqbal* standard). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

### III.   DISCUSSION

#### A.   Relevant Contract Provisions

The parties' contracts contain "Business Income" and "Extra Expense" provisions that state, in relevant part:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension"[] of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income

3

> Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.
> . . . .
> Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss. We will pay Extra Expense . . . to:
> (1) Avoid or minimize the "suspension" of business and to continue operations at the described premises . . . .
> (2) Minimize the "suspension" of business if you cannot continue "operations".

(Civ. No. 21-19539 at D.E. 6-2 (Declaration of Marci Kokolas, Esq. ("Kokolas Decl.")) at Ex. B (the "Contract" or "Contracts") at 29.)[1]  Notably, both provisions require a "direct physical loss (of) or damage to property" to trigger coverage.  (*Id.*)

The Contracts also contain a "Civil Authority" provision that covers losses and expenses "caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:"

> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(*Id.* at 30.)

Critically, "all coverage" under the Contracts is limited by an endorsement titled "EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA," which states, *inter alia*:

---

[1] This opinion cites only to FLCC's contract with HPIC for convenience, but the corresponding provisions of Elan's contract with HIC are substantively identical. (*See* Civ. No. 21-19497 at D.E. 13 at Ex. B.)  Citations to contract page numbers in this opinion refer to HPIC Bates numbering.  Although Plaintiffs did not attach the Contracts or Executive Orders that they rely on to their Complaint, this Court may consider the documents because a court deciding a Rule 12(b)(6) motion may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).

4

> We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

(*Id.* at 38 (the "Virus Exclusion" provision).)

Plaintiffs allege that they are entitled to coverage for losses sustained during the COVID-19 pandemic, specifically for losses that occurred as a result of Governor Phil Murphy's Executive Orders ("Executive Orders" or "EOs"), which restricted restaurants to take out and delivery only in order to curb transmission of the SARS-CoV-2 virus that causes COVID-19.  (*See* Compl. ¶¶ 58–76; Kokolas Decl. at Exs. F, G, and H (Executive Order Nos. 103, 104, and 107).)  Plaintiffs further allege that the Executive Orders caused a "physical loss of" their properties and that they are therefore entitled to coverage under the Business Income, Extra Expense, and Civil Authority provisions.  (*See* Compl. ¶¶ 74–83; Pl. Opp. Br. at 7–29.)  Plaintiffs argue that the Virus Exclusion does not apply because their losses were directly caused by the Executive Orders and not by the SARS-CoV-2 virus itself, and also because the Virus Exclusion may be unenforceable under New Jersey's regulatory estoppel doctrine.  (*See* Compl. ¶¶ 88–104; Pl. Opp. Br. at 30–39.)

In moving to dismiss the Complaint, Defendants contend that the direct cause of Plaintiffs' losses was the SARS-CoV-2 virus, that the Virus Exclusion applies in full force to bar all coverage, and that even if the Virus Exclusion did not apply, Plaintiffs did not sustain a "physical loss" to trigger coverage.  (*See* Civ. No. 21-19497 at D.E. 9, 12; Civ. No. 21-19539 at D.E. 6, 10.)  This Court will address the parties' arguments and, for the reasons below, grant Defendants' motions.

**B.     Virus Exclusion**

Although the Virus Exclusion bars Plaintiffs' claims by its plain language, Plaintiffs argue that it should not apply because New Jersey courts apply a doctrine known as Appleman's Rule or the "efficient proximate cause doctrine." (*See* Pl. Opp. Br. at 2, 30–35.)  Under this doctrine, an

5

exclusion does not apply when a loss arises from a chain of causation in which either the first or last cause in the chain is a covered cause. *See Franklin Packaging Co. v. California Union Ins. Co.*, 408 A.2d 448, 449–50 (N.J. Super. Ct. App. Div. 1979). Plaintiffs argue that Governor Murphy's Executive Orders, and not the virus, were the last cause in the chain of causes that resulted in Plaintiffs' losses, and the Virus Exclusion should therefore not apply. (*See* Pl. Opp. Br. at 30–35.) They further argue that to exclude coverage when both included perils and excluded perils together cause a loss, an insurer must include an anti-concurrent causation ("ACC") clause in the exclusion. (*See id.* at 32–34); *see, e.g.*, *Metuchen Ctr., Inc. v. Liberty Mut. Ins. Co.*, Civ. No. 20-12584, 2021 WL 3206827, at *6 (D.N.J. July 29, 2021).

Here, the Contracts' Virus Exclusion does not contain an ACC clause, (Contract at 38), but its absence does not render the Virus Exclusion inapplicable. Courts in this District have consistently held that the SARS-CoV-2 virus is the proximate cause of business losses resulting from the pandemic, and they have consistently applied the Virus Exclusion to preclude coverage regardless of whether the exclusion contains an ACC clause. *See J.G. Optical, Inc. v. Travelers Cos., Inc.*, Civ. No. 20-5744, 2021 WL 4260843, at *5 (D.N.J. Sept. 20, 2021) (compiling cases). These courts have expressly rejected the argument that Governor Murphy's Executive Orders, and not the virus, were the proximate cause of policyholders' losses. *See id.* As the court explained in *J.G. Optical*:

> Here, the Virus Exclusion does not contain an anti-concurrent or anti-sequential clause that would exclude coverage regardless of the sequence of events leading up to Plaintiff's loss. Nonetheless, this does not mean that the Executive Orders were necessarily the efficient proximate cause of Plaintiff's losses merely because they were last in a series of events which lead to the closure of Plaintiff's business. There is no dispute that the Executive Orders were issued solely to mitigate the spread of COVID-19 and would not have been issued but for the spread of the Virus within New Jersey. . . . . Thus, COVID-19 and the Executive Orders issued to prevent its spread should not be seen as two separate, independent events contributing to a loss but rather as inextricably intertwined such that the latter were entirely dependent

6

> and preconditioned on the existence of the former. Accordingly, the Court finds that COVID-19 was the efficient proximate cause of Plaintiff's losses and, as such, Plaintiff's claims for insurance coverage with respect thereto fall squarely within, and are barred by, the Virus Exclusion. In so finding, the Court joins the growing list of courts within and outside of this District that have reached the same conclusion when analyzing similar or identical virus exclusions.

(*Id.*)

Plaintiffs' Complaint and opposition brief focus heavily on the supposed uniqueness of New Jersey insurance law, asking this Court to ignore the legion of decisions from courts in this District and across the country finding that similar insurance contracts do not protect against COVID-19 losses. (*See, e.g.*, Pl. Opp. Br. at 1 ("The law in New Jersey is dramatically different than it is in almost all other jurisdictions. Fortunately for policyholders in this State, New Jersey Appellate courts have interpreted the operative policy provisions significantly more broadly and in favor of coverage than the decisions the Defendants cite in support of their arguments.").) However, this Court need not guess how New Jersey's Appellate courts would decide the matter because New Jersey's Appellate Division recently issued a single opinion rejecting substantively identical arguments from policyholders in six separate appeals:

> The endorsements in the policies . . . did not contain anti-concurrent causation language but required the insurers to show that their claims were "caused by or resulted from" the COVID-19 virus to disclaim coverage. The phrases "caused by" and "resulting from" have been interpreted as "clearly convey[ing] the idea of proximate causation." The EOs, which were not an excluded peril, were the final step in the sequence that caused plaintiffs' businesses to shut down or curtail their operations and suffer income losses.
>
> Yet, following the Appleman rule, the EOs were only issued to curb the COVID-19 pandemic, making the virus the efficient proximate cause of plaintiffs' losses. Therefore, . . . we conclude the EOs were inextricably intertwined with COVID-19. Because plaintiffs' business losses thus were "caused by or resulted from" COVID-19 virus, their policies' endorsements bar coverage.

*MAC Prop. Grp. LLC v. Selective Fire & Cas. Ins. Co.*, No. A-0714-20, 2022 WL 2196396, at *16 (N.J. Super. Ct. App. Div. June 20, 2022) (internal citation omitted). This Court reached a similar

7

holding in January 2021 when it held that, "Because the [Executive] Orders were issued to mitigate the spread of the highly contagious novel coronavirus, Plaintiffs' losses are tied inextricably to that virus and are not covered by the Policies." *7th Inning Stretch LLC v. Arch Ins. Co.*, Civ. No. 20-8161, 2021 WL 800595, at *3 (D.N.J. Jan. 19, 2021). Subsequent cases have only solidified that holding and this Court will not change course today.

Alternatively, Plaintiffs argue that Defendants are estopped from enforcing the Virus Exclusion because insurance industry trade groups allegedly misrepresented its scope to New Jersey regulators. (*See* Pl. Opp. Br. at 35–39.) "Under the doctrine of regulatory estoppel, if an insurer makes misrepresentations to a regulatory body regarding the meaning and effect of language it has requested to include in its policies, the insurer may be prevented from enforcing the otherwise clear and plain meaning of that language against an insured." *MAC Prop. Grp. LLC*, 2022 WL 2196396, at *11 (citing *Morton Int'l, Inc. v. Gen. Accident Ins. Co.*, 134 N.J. 1, 75–76, 629 A.2d 831 (N.J. 1993)). Specifically, Plaintiffs allege that the Insurance Services Office (ISO) may have made misrepresentations to the New Jersey Department of Banking and Insurance in 2006 in order to secure approval for the Virus Exclusion. (*See* Compl. ¶¶ 99–104.)

As an initial matter, Plaintiffs' factual allegations are threadbare and "do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. Moreover, both New Jersey's Appellate Division and federal courts have rejected the same allegations. For example, in *Mark Daniel Hosp. LLC v. Amguard Ins. Co.*, Chief Judge Freda Wolfson analyzed ISO's 2006 statements and dismissed the plaintiff's complaint with prejudice, concluding that the "[p]laintiff's regulatory estoppel claim [wa]s meritless" and that the "[p]laintiff ha[d] failed to demonstrate any inconsistency between insurance industry representations to regulators and [the d]efendant's interpretation of the Virus Exclusion." Civ. No. 20-6772, 2022 WL 2168245, at *10–

11 (D.N.J. June 16, 2022) (compiling cases rejecting regulatory estoppel arguments with respect to the Virus Exclusion). The New Jersey Appellate Division also evaluated these statements and reached the same conclusion:

> We agree with the reasoning expressed by the federal courts and thus reject plaintiffs' regulatory estoppel arguments. Allowing plaintiffs to amend their complaints to add regulatory estoppel claims would not result in a different outcome. Their claims would eventually fail because defendants have not taken a position regarding the interpretation of the virus exclusions that is any different from ISO's representations to regulators as set forth in the federal court rulings. ISO told regulatory bodies in 2006 that the new virus exclusion would bar all coverage for virus-related damage and losses.

*MAC Prop. Grp. LLC*, 2022 WL 2196396, at *13. Accordingly, this Court finds that the Virus Exclusion bars Plaintiffs' claims for coverage and will dismiss the Complaint with prejudice.

### C. Business Income, Extra Expense, and Civil Authority Coverage

Briefly, this Court notes that even if the Virus Exclusion did not apply, Plaintiffs would not be entitled to Business Income or Extra Expense coverage because these provisions require "direct physical loss (of) or damage to property," (Contract at 29), and "the presence of a virus that harms humans but does not physically alter structures does not constitute coverable property loss or damage," *7th Inning Stretch LLC v. Arch Ins. Co.*, Civ. No. 20-8161, 2021 WL 1153147, at *2 (D.N.J. Mar. 26, 2021) (compiling cases). *See MAC Prop. Grp.*, 2022 WL 2196396, at *9 (compiling cases from the 2nd, 5th, 6th, 7th, 8th, 9th, and 10th Circuit Courts of Appeal "grant[ing] defendant insurers' motions to dismiss complaints seeking insurance coverage for business losses due to government orders barring or curtailing their operations in an effort to curb the COVID-19 pandemic because the losses were not due to physical loss or damage to their insured premises").

Plaintiffs ignore these cases and cite instead to pre-pandemic opinions to argue that New Jersey law is somehow different. (*See* Pl. Opp. Br. at 10–16 (discussing *Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 968 A.2d 724 (N.J. Super. Ct. App. Div. 2009), in which issues with

9

the regional electric grid caused power loss at plaintiff's supermarket); *id.* at 13 ("Obviously, the *Wakefern* decision is extremely important to Plaintiffs' case.").)  Relying on these opinions, Plaintiffs argue that the "direct physical loss (of) or damage to property" requirement in the Contracts is "ambiguous" and "does not require 'structural' damage," but only requires "loss of use, loss of access or loss of functionality." (Pl. Opp. Br. at 39–40; *see id.* at 7–28.)  However, the New Jersey Appellate Division's recent opinion in *MAC Prop. Grp.* expressly rejects that argument:

> We disagree with plaintiffs' contention that the term "direct physical loss of or damage to," as set forth in their insurance policies, is ambiguous. The term was not so confusing that average policyholders like plaintiffs could not understand that coverage extended only to instances where the insured property has suffered a detrimental physical alteration of some kind, or there was a physical loss of the insured property.
> . . . .
> Here, there was no damage to plaintiffs' equipment or property on or off-site that caused their premises to lose their physical capacity to operate, and there was no physical alteration that made their premises dangerous to enter. . . . . Instead, plaintiffs' businesses were shut down or had their operations limited by the EOs. Each plaintiff would have been able to continue functioning . . . without interruption had Governor Murphy not issued his EOs. None of plaintiffs' premises required any repairs due to damage, nor needed to be relocated and then reopened once the EOs' effective period ended.

2022 WL 2196396, at *6–7 (distinguishing *Wakefern*).

Nor would Plaintiffs be entitled to Civil Authority coverage on account of Governor Murphy's Executive Orders, as the New Jersey Appellate Division has made clear. *See id.* at *11 ("[P]laintiffs' business losses were not protected by their policies' civil authority coverage. . . . [T]he EOs neither prohibited access to plaintiffs' premises nor prevented plaintiff owners from being on their premises, but merely restricted their business activities."). Accordingly, this Court must dismiss Plaintiffs' Complaint with prejudice.[2]

---

[2] The Complaint also alleges that Defendants owe "Communicable Disease and/or Food Contamination" coverage to Plaintiffs. (Compl. ¶¶ 106, 109; *see* Compl. ¶¶ 45–46.)  Plaintiffs do not address this basis for coverage in their

IV.     **CONCLUSION**

Although this Court is sympathetic to the losses that Plaintiffs have suffered during this pandemic, it cannot give them the relief they seek.  For the reasons set forth above, Defendants' Motions to Dismiss are **GRANTED WITH PREJUDICE**.  An appropriate order follows.

    /s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:    Clerk
cc:    Jessica S. Allen, U.S.M.J.
    José R. Almonte, U.S.M.J.
    Parties

---

opposition brief.  Even if they did, the argument would not succeed because the Complaint does not contain sufficient factual allegations to support a claim for coverage under this provision.  The provision expressly requires (1) that the insured's business was ordered closed by "the Board of Health or any governmental authority" and (2) that the closure was the result of the discovery or suspicion of "food contamination," which is defined to mean "an incidence of food poisoning to one or more of [the insured's] patrons as a result of: (a) tainted food [the insured] purchased; (b) food which has been improperly stored, handled or prepared; or (c) a communicable disease transmitted through one or more of [the insured's] employees."  (Contract at 62–63 (some capitalization omitted).)  There are no factual allegations here that Plaintiffs' businesses were closed by a governmental authority because a patron was suspected to have suffered food poisoning.

11